Number 20-1389 Cogentrix Energy Power Management LLC and Vistra Court Petitioners versus Federal Energy Regulatory Commission. Mr. Jones for the petitioners, Mr. Glover for the respondents. Good morning, Council. Mr. Jones, please proceed when you're ready. Good morning, Chief Judge Srinivasan, and may it please the Court. Christopher Jones for petitioners Cogentrix and Vistra, the owners of several New England power plants that have designated as critical to the reliable operation of the power grid in the Northeast United States. I've asked the courtroom deputy to reserve three minutes for rebuttal. Petitioners were compelled by law to incur new costs to help keep the lights on in New England. They did so, and they now seek cost recovery. That's all this case is about. But in its orders below, the commission, despite decades of reviewing utility costs after the fact, held that a regulated utility must make a rate customers. In our view, FERC's orders badly misconstrued the filed rate doctrine and the rule against retroactive rate making, and the best evidence of that is FERC's inability to produce a single example of another rate having been designed this way in its 85-year history of setting utility rates. Now, the problems with FERC's application of the filed rate doctrine and rule against retroactive rate making are several, but before I walk through them, I'd like to take just a moment to address the statutory framework because the context of this is important. We respectfully suggest that Congress pass section 219d4 of the Federal Power Act in 2005 to prevent FERC from doing exactly what it did here, finding some creative way to disallow rate recovery of mandatory costs spent to safeguard the reliability of the grid. Section 219 stems from the 2005 amendments to the act following the historic northeast blackout of 2003, which were caused in significant part by the lack of a mandatory and enforceable reliability regime. So Congress erected an entirely new regime and required FERC to issue new standards and made them mandatory and empowered FERC for the first time to issue civil penalties to the tune of $1 million per day per violation. Congress was foisting compliance costs and penalty risk on the industry and thus included a special provision to address cost recovery. Section 219b4 directs FERC to permit the recovery of all prudently incurred costs of complying with the new mandatory standards required by the act. Now 219b4 must be read as a special rule in our view because 80 years of Federal Power Act jurisprudence already provide for the utility customers the cost of its prudently incurred costs of providing public utility service. So in our view 219b4 must mean something more. Now FERC says that 219d and the reference there to just and reasonable rates necessarily required the temporal cutoff it created in this case. Now we explained in our briefs why FERC's textual analysis of section 219d is wrong and why we think the words just and reasonable must mean the same thing in sections 205 as it does in 219. But you know tonight we would urge the court to sort of focus on a simpler notion which is if FERC's view of the statute is right, 219b4 and the cost recovery directive therein is rendered entirely superfluous and is read out of the statute. Now even if the court doesn't agree with us on the statute, FERC's application of the filed rate doctrine and rule against retroactive rate making in this case is also clearly wrong. And I'd like to quote briefly from the Niagara Mohawk case that we have cited throughout this proceeding and we've received more answer to from the commission. There the commission described. Can we just, sorry, can we just talk about the statute for a minute? So there's in 205 and all of the history with similar schemes there comes this very strong presumption against retroactive rate making, right? You have to file the tariff first and then you can only recover costs prospectively as outlined in the tariff, right? Generally yes, your honor. So doesn't your position, your position has to be that 219 affects an implied repeal of the filed rate doctrine? The textual construct of 219b4 and its references only to 205a and 205b I think your honor would support that conclusion. But you, do you agree with that framing? I do, but I would suggest that even if the court doesn't, you know, we have an independent basis to reverse the commission on its own. In other words, I understand if you go to D, I understand your argument that the text of D can be read to simply say that 205a and b remain effective and you say that the filed rate doctrine arises out of 205c and d. And let's assume I agree with that much of your argument, but you still need something else to turn off c and d to affect the implied repeal of c and d. So where do I get that from 219? I think the mere presence of 219b4, your honor, would do that in so far as Congress had to speak to this for a reason. In other words, you know, we already knew from section 205 as I mentioned that we had the ability to recover costs. Okay, so if you go to b4, it's either d or b4. So if you go to b4, your argument has to be that all means all, right? And that includes costs incurred after the filing of a tariff as well as costs incurred before the filing of a tariff. But, you know, there's this strong background rule that all doesn't mean all. It means all costs incurred after the filing of a tariff, which strikes me as sort of a FERC-specific analog of the presumption against statutory retroactivity where, you know, wholly apart from filed rate doctrine, if you had a statute that said all costs, you would not read that to mean costs incurred before the statute was enacted. So why wouldn't we read all costs in b4, sort of, you know, consistent with the filed rate equivalent of that statutory presumption, all costs incurred after filing the tariff? Well, again, your honor, I don't think that's the rule, that it's costs recovered after the filing of the tariff. And so, in other words, the long history of the commission has been to approve costs after they are incurred. The Columbia gas case we cited at page 42 of our initial brief is sort of the garden variety of retroactive rate making case where a pipeline tried to go back and change the costs that were charged to customers after those costs had already been settled. And that's not at all what happened here. We had no rate. We had no ability to file a rate. So the retroactive rate making rule does not suggest that costs incurred before a rate filing is tendered are disallowed. That's not what the rule says. And so, to answer your statutory question, it's entirely reasonable, I think, to read the statute in light of the commission's history of approving costs after they are incurred under the prudent utility manager standard, which we cited throughout our pleadings and our briefs, the commission has not had an answer to. So what does it bar? What does the retroactivity mean, then? So it keeps it fences some things out. And what you're saying is it doesn't fence out everything that predates the filing of a tariff. That's right, your honor. So once we have a tariff and we file and we start recovering, we are going to be barred by the filed rate doctrine, the rule against retroactive rate making from going back and changing those rates as charged and settled with customers. And again, that's sort of the Columbia gas example I provided. Once we've settled up with our customers for a past period, we can't then go back over time. The key distinction here is we have no rate. The commission keeps saying that we've charged customers for the service and that we've been compensated for it. Well, that's news to us because we don't have a rate on file. And that is the key distinction here. So all we're incur costs during the nascent years of this reliability regime. At some point, you need to file a rate and seek recovery of them. And that's not at all. When you say we have no rate, you mean you didn't have a rate that would allow for the recovery of the security costs or the enhancement? You had a rate. You weren't working for nothing. That's true, your honor. And we have a general market based rate tariff that permits us to participate in the market and sell power. But again, the commission here, having endorsed this notion of Schedule 17, says specifically these costs, these reliability costs, should be non-market costs because only we, these special generators, have to pay for them. And FERC, as you know, goes to great lengths to they clearly understand the notion that a special subset of generators that play a higher role in maintaining the reliability of the grid and have additional costs shouldn't be forced to recover those under their market based rate tariffs where they're competing with everybody else. Do you represent all of the critical facilities within the New England ISO? Your honor, that's a question I don't know the answer to because I think these designations can be fluid. So I actually don't know if there are more designations for units besides the two entities that signed our briefs. The reason I'm asking is I wonder if the other companies filed rather quickly, years ago, filed for recovery of these security related or efficiency related matters. That I can't answer, your honor. The answer is no. And the primary reason for that is we as independent generators, not vertically integrated utilities, we have no contractual privity with a customer base. We rely entirely on ISO New England to pass through costs to customers. So we had no, we the generating community, speaking here at large, had no unilateral ability to come to the commission and cite section 219 and say I'd like my costs, please. That had to be developed through the ISO New England process, which as the record shows was a source of the unfortunate delay over these last few years of getting them right on file. But that we don't think is determinative of the legal outcome. Sorry, why couldn't you unilaterally file a tariff and say now that we have this new legal obligation imposed on us, we're going to recover the prudently incurred costs associated with it? So the vehicle for charging customers in New England has to be through the ISO New England tariff. So even if we filed a rate schedule, we would have no ability to simply stick bills in the mail to New England customers. That would have to flow through the ISO. And so ISO New England went through the stakeholder process, a various committee process that everybody's obliged to follow through participation and signing the membership agreement, which we did in good faith and reliance on the ISO to do that. Schedule 17 is clear that at least going forward, you can, the individual generators can make their own Section 205 filings. And once Schedule 17 is in place, that's true, right? And I think we read that to mean is if you don't like the specific formula that's attached to Schedule 17 and you want to do something else, you're free to do that. But Schedule 17 still provides the, you know, is now provides the notice that the commission says it is so critical to the customers that these costs. Could you have supplied that notice by filing, making your own 205 filing right at the beginning? And then at least you would have protected yourself on retroactivity grounds because that would have been notice. I think the commission will tell you, Your Honor, that notice would only be effective if that rate schedule were filed. And we have a pretty strong view that the commission probably would have rejected that as lacking any basis in the ISO New England tariff to charge customers an out-of-market cost. Because again, all the market costs, the entire cost, the decision to charge market or out-of-market is all within the umbrella of the ISO tariff and FERC's regulation of it. So we're quite confident that had we done something like that unilaterally, we would have been kicked out on procedural grounds. Now, if I might spend just a moment on what Schedule 17 does say, which is that it contains only one temporal requirement for cost recovery, and that's that the cost must have been incurred during the period in which the subject facility was designated as critical. Now we met that requirement. FERC still says no on the basis that Schedule 17 is somehow ambiguous. But we think FERC frankly gave away the farm in its deficiency letter when it, this is JA page 132, when it to the ISO during the proceeding that based on this language, that was the phrase that it used, Schedule 17 appears to allow retroactive recovery. And then if you look at the Lowell testimony accompanying the ISO's filing at Joint Appendix page 70, it's pretty clear there the witness testifies that the rate design was intended to cover the quote previously paid costs that were incurred. So in our view, FERC manufactured the ambiguity in order to apply the filed rate doctrine, which again, doesn't even really apply here. And if I might just cite the commission's own words from Niagara Mohawk, the filed rate doctrine and rule against retroactive rate making are grounded in the enforcement of the terms and conditions of a filed rate schedule, but there is no such rate schedule here. We think that's directly on point, Your Honor. We've cited that case three different times in this proceeding and the commission hasn't answered it. I see I am out of time. So if the court has no other questions, I'll reserve the balance for rebuttal. Okay, thank you, Mr. Jones. Mr. Glover, we'll hear from the commission now. Thank you, Chief Judge, and may it please the court. I'm Matthew Glover, and I represent respondent, the Federal Energy Regulatory Commission. This is principally a case about tariff interpretation, but I'd actually like to start by responding to a point that petitioner just made regarding the deficiency letter. They say twice in the reply brief, once at page one to two, and once at page nine, that somehow the deficiency letter conceded that schedule 17 was not clear. And I have three responses to that. The first is that the deficiency letter made clear that it was not the commission's official or final statement on this. It was a statement from staff in the Office of Energy Markets asking for more information and informing the filing party, the New England system operator, that their filing was deficient and couldn't be considered by the commission. So the commission wasn't making any pronouncement on what the statute said. If anything, it was suggesting your filing is unclear to us, and we would like more information. The second point would be, the commission was clear in both the initial order and the rehearing order, which are what's on review here, that it thought that the tariff was ambiguous. I apologize, I think I said statute a second ago. I'm talking about the tariff, the schedule 17 filing, and that schedule 17 is best read as permitting only forward-looking costs. How do you get that out of the language of schedule 17? Usually you get prospectivity out of provisions that are silent with regard to temporal scope. This schedule is very explicit as to temporal scope. It says costs are recoverable to the extent incurred during the period when the facility is designated, and the designation here happened a couple of years before the tariff filing. So your honor, section 2.2a Romanet 1 says what you said, section 2.2a Romanet 2 says, and during the cost recovery period that'll be designated in schedule 17, and then Romanet 3 says that the recovery will be through a section 205 filing. A section 205 filing allows you to file a rate that you will charge forward-looking, and so the commission was basically harmonizing, I think is the word we use in the rehearing order, Romanet section 2.2 Romanet 1, 2, and 3 to provide for only forward-looking costs, and this was actually my second response on the deficiency. What would Romanet 1 do on that view? I mean of course they need a 205 filing because the past tariff doesn't account for these newly created obligations. Your honor, so my first response would be no, the commission disagrees with the statement that the past tariff doesn't account for these newly imposed obligations. This goes to our point that they had the opportunity to recover costs in the market. If you step back and think generally, these are generators. Generators typically provide service in the market and receive a market rate, and you're presumed when you're participating in the market that the market rate is covering your costs, and so the commission was presuming when these generators were participating in the market that they were recovering their costs. The New England system operator came forward and said, for certain designated critical facilities, the medium impact, we would like to create a billing mechanism where on transmission rates, which requires our cost-based rates, and it requires recovery by the New England ISO collecting and then passing it back to the parties. We'd like to create this new Schedule 17 that medium impact facilities can use to recover their incremental costs, but the example I think captures this is all facilities have to comply with Section 205 critical facility requirements for the low impact category, and the New England system operator didn't propose some new recovery for the low impact category. It's presumed that transmission facilities that are charging cost-based rates in their cost-based rates will recover their costs to comply with the low impact category, and that generating facilities are currently and will continue even after Schedule 17 to recover those costs for the low impact category through their participation in the market. The system operator here is giving a new mechanism that will allow recovery of these costs separate and apart from market participation for these generators, but it's still... So is the short answer then that Romanet One still does work even if it of its own force doesn't talk about retroactive recovery because it adds to the market-based rate for these medium facilities in a way that wouldn't otherwise be in existence? Yes, in that you must, like your recovery must be the period that you were designated a medium facility, yes. Romanet One is saying the only costs we're allowing are these incremental costs during this period you're designated, and you're recovering those through a Section 205 filing, and the Section 205 filing allowing only forward-looking recovery of costs because you need to provide notice, you can't retroactively recover for under-compensated rates. So I think that's how we're harmonizing the entire thing. On their theory... Sorry, I missed that. If Romanet Three on your theory sets the clock, starts the clock from the moment of the 205 filing and directs it only going forward, then that will necessarily pick up every period in which the facility was designated because it was designated before the 205 filing was made. You're saying, I guess, it's covering a hypothetical of someday down the road they get undesignated? So if facilities can have their designation changed to low impact from medium impact, other facilities may later be designated medium impact, so it's providing for that. And I think it's helpful to look at JA 135, the system operator who wrote the tariff filing, their response to the Commission's question regarding what Section 2.2a Romanet One means. At the top of the page, they say Section 2.2a Romanet One of the proposed Schedule 17 does not address the recovery of, and they use an acronym, but this just means critical facility costs, the medium impact incremental costs, incurred prior to the requested effective date of March 6, 2020. So the system operator is saying right there that it doesn't think Romanet One is talking about any costs incurred prior to March 6. And that's where we said in the rehearing order and we said in our brief that the system operator itself was acknowledging the ambiguity. I mean, they just gave a non-answer, right? They just put it on the individual owners to make the case. No, Your Honor, I disagree. We asked them whether they think this specific language is providing recovery prior to that, and they said that it doesn't, that provision, sorry, it does not address the recovery. So this provision doesn't answer the question. They said if an owner wants to seek recovery for periods before the effective date, the owner must explain why the filed rate doctrine and the presumption against retroactivity don't apply. Yes, and that's their section to be if the answer to A was yes, but their answer in A was not yes. Their answer in A was that it doesn't address it. And so again, we read that in conjunction with Romanet Three, which sets up or brings in the traditional section 205 filing requirements that only permit going forward costs. Suppose it did, suppose it did, suppose Schedule 17 did address it and said that the generators are entitled to recover all of their past costs that were incurred as a result of being designated a critical facility. If the schedule did say that, wouldn't that violate the filed rate doctrine? Yes, absolutely, Judge Randolph. I have two points on that. The first being, if the schedule said that explicitly, this is, again, you start with our tariff interpretation, our tariff interpretation would be unreasonable, and you'd vacate, you know, what we did because we unreasonably read the tariff as ambiguous. But the commission in explaining and responding to petitioners, or actually, it's only two of the critical facilities here, but the critical facility owners, the eight of them that participated at the commission level and a few other entities in responding to them, the commission did explain that allowing these retroactivity, and so we were interpreting the tariff in light of those background principles. Suppose I disagree with your reading of the tariff, but agree with what Judge Randolph just said, which is a retroactive recovery going back to 2014 would violate the filed rate doctrine. Are you saying we can't affirm on the ground that you have alternative rationales, you have a tariff-based rationale, and you have a rule against retroactivity rationale? I thought you had both. We do have both. I guess it's difficult because you'd be saying we were unreasonable in our interpretation of the tariff, but our interpretation complies with the filed rate doctrine. It seems like it's an independent statutory rationale. Yeah, I think you could affirm on that ground. I think you could affirm on that ground. It's a little difficult because I'm understanding you to say that the tariff is unambiguous and it does allow backwards looking costs. We don't think so, but the tariff was therefore unjust and unreasonable, or it violated the filed rate doctrine if it allowed for those costs. I guess that's sort of a remedy aspect. You'd be allowing us to keep Schedule 17 in the New England System Operators Tariff to recover forward-going costs because recovering backward-going costs violates the filed rate doctrine. The commission, in discussing the filed rate doctrine and rule against retroactivity, was explaining to petitioners and these other critical facilities that participated why it would violate those doctrines to interpret the tariff as they wished. Can I ask you what the individual entities are supposed to do if the system operator – let's just say the system operator just waits for a long time and the individual entities want to trigger their ability to recover for costs that are being incurred. Are they stuck or is there something they could do? So, a couple of points to that, Your Honor. Again, we think Section 219 said we need to propose a rule within one year, which we did in the incentives rule, allowing for incentive-based rate treatments, including allowing recovery of these costs. We laid out a rule in 2006. The hearing orders didn't address these provisions, so everyone knew in 2006, but even in 2007 that we would allow for recovery in rates that were sought under that. And in 18 U.S.C. 35, we made clear that any rates you wanted to recover under that rule would be following the filing procedures of Section 205. Now, when they began incurring these costs, as petitioners' counsel said, because the mechanism here for recovery, the new mechanism, is a transmission – it's a cost-based mechanism on transmission fees. They couldn't file for that. The New England system operator is the only one that can file for changes to its tariff on that aspect. But they could have done a couple things if they thought that the market rates they were receiving were not allowing them to recover these critical facility costs. They could have filed a Section 206 proceeding saying the market rates as applied to us are unjust and unreasonable because we are entitled to recover these costs and we are not able to recover them. They didn't do that. There's also provisions in the Commission's rules, and they didn't come up in this case, I think it's like 18 CFR 385.713, but they mimic 5 U.S.C. 555E, where you can ask the Commission for a declaration for clarity within sort of what's going on in its jurisdictional area. And so in theory, they could have in 2013 said, or 2014, we've just been designated, we're about to start incurring these costs in 2016. We would like to know that we'll be able to recover these costs, even though they're in a special mechanism, even though the New England system operator hasn't filed a special mechanism at this point, the transmission tariff doesn't allow for it. And the Commission would have told them, we think you recover these in the market, but if you'd like to recover them through a special mechanism, the system operator could propose one. And if it complies with the requirements of the regulation, we will approve it, which we did here. So as a general matter, wholly apart from 219 and the cyber issue, all of the tariffs are filed by the ISO, not by the individual owners. So the cost-based rate of availability in the open access tariff, like the amendments and adjustments to that are filed by the system operator, it has the filing rights. And what's happening here is it's added to that tariff, this Schedule 17, which describes the rates and it provides a form. And so what system operators do, and I think in their reply brief, they cited their own filings with the Commission. Dynegy, I think, is the either upstream or downstream entity that represents Vistra. And I can't recall the Cogentrix entity, but they file a, you know, 205 filing with the Commission saying, we would like to use Schedule 17 to recover our critical or incremental costs between the low and medium level of our critical facility designation. And here are the types of costs we're seeking to recover. Yeah, that's what I'm finding sort of puzzling because the way this seems to work in 219 is really the important Section 205 filing is the follow-on one that's contemplated for the says there will be future filings in which people can seek to recover for labor equipment, other costs. Doesn't feel like a formula. It doesn't feel like it gives much notice to anyone. Feels like all of the media information is going to come in the later filings, which are coming from the individual owners. So I had thought background rule is the individual owners are doing the filings here. I know I'm in the red light, but I have a number of points to respond to that. I'll try to keep it brief though. The first is, yes, Your Honor, you absolutely understand this correctly, but the individual owners are doing the filings that are providing notice that are describing what they're going to recover. But these are generators here and generators, again, typically recover their costs through a market-based rate. And the ISO is giving these generators this special cost recovery mechanism that transmission purchases are going to pay in the under the tariff for transmission services. So people who purchase wholesale power are using the transmission system in the ISO. And so this is giving them a mechanism under the Open Access Transmission Tariff or the OATT, I just call it the tariff though, to file a Schedule 17 filing with the Commission to recover. Otherwise, when you're providing transmission service, you get your costs under the other schedules and under other provisions of the tariff, but the tariff didn't have a transmission provision providing for this specific recovery. And so this goes back to, and I hope I sort of, again, giving a broad market overview, clear things up a little bit, that generators typically recover their costs through the market-based rates for generation, the clearing price, and that this is a separate opportunity for both generators and transmission facilities that would be designated medium impact to recover these costs. But the generators are going through the transmission tariff for this limited purpose. Yeah, for this specific incremental set of costs. And Judge Katsas, I think you were hitting on the point that the meat of what's going to be recovered and all of that is in the Section 205 filing. And I think it was Paragraph 28 of the initial order, the Commission pointed out that there was an entity that wanted a formula-based rate for these recoveries in Schedule 17. And we said, your Schedule 17 filing, your later 205, could seek a formula-based rate, or you could specify the costs that you have in this period that you want to recover. So you could use a formula rate, but you can also just use this schedule and identify your costs. And that's how we're recovering them going forward. And that's why we're not letting you recover for, you know, the market participation you had since 2013, where we think you had the opportunity to recover these recovery of that. And I'm well over time, but I can make one more point in response to your question, Judge Katsas. I think you used the word, the meat of the proceeding is going to be in the Critical Facilities 205 filing. And that's absolutely true. And that's where the prudence review will occur. If you look at the cases they cite for prudence review, particularly, I think there's like a Northern California or Transmission Agency of Northern California versus 495F3, it's 663, but it's 672 note eight. And this case is cited in the blue brief at 29. It describes the prudent standard as a mechanism by which a complainant can challenge utilities rate under the just and reasonable standard, semi-colon. It is an evidentiary tool designed to facilitate a rate challenge. So when the critical facility owners file their 205 proceedings, stating the costs they would like to recover using Schedule 17, the commission will engage in prudence review, and it needs to ensure that those costs are just and reasonable. And a party that would have to pay those costs that might think they aren't prudent, can use the prudent standard as an evidentiary standard to challenge that later filing. Before you sit down, one question that keeps recurring to me, and that is, is there anything unique about ISO New England, as opposed to other regions? Forget about Texas. Excuse me. Has this issue, another way of asking the question is, has this issue, the issue that we're dealing with here, come up in other regions of the United States? So in preparation for the argument, I spoke with commission staff and with people that deal with these filings, and they weren't aware of any other ISO or RTO system operator filing a transmission tariff-based mechanism to recover these costs. So they're all being recovered by market-based rates throughout the United States? If you were a generator, they would be recovered by market-based rates. If you were a transmission, most transmission tariffs, there are some exceptions if you have a contract and things like that, but most transmission providers or transmission facilities recover their costs through these cost of service rates in the open access tariff. So if you were a transmission provider in ISO New England, and you were recovering those rates through your cost-based rate making with the ISO, that these were just among the costs that you were recovering. I would say there is, I don't think it's not unique legally about the New England system operator, but just to fully answer your question, this statute in part was passed because of reliability issues in New England. And I think, again, in talking with staff, the New England system operator has been maybe a leader in really applying the critical facilities rules and a leader, sort of one of the earlier system operators to engage with these rules and want to assure that the New England storms that led to the statute don't happen again in their system. Okay, thank you. Thank you. Just, sorry, one last question. On the statute, on 219, what's your response to what I think is the best argument on the other side, which is 219 seems to do oddly very little if it simply means it preserves the filed rate doctrine and the rule against retroactivity and just confirms what would can be recovered. Is the work there, what you were talking about in shifting from a market rate to a cost rate, is that the work it's doing? As to the B4, yes, absolutely, that would be the work it's doing. 219 itself obviously required the commission to issue a lot of other incentive rates. 219, when you look at it writ large, it seems that Congress is very intent on encouraging this kind of investment and making sure that generators are compensated for it. It's a pro-recovery statute and just seems odd in that context if you read all of this background rules. So 219 is, I think it's fair to say it's an incentive recovery statute, but the regulations, the rule we passed pursuant to it has a lot of different incentive rate treatments. This is just one, you know, we had the San Diego gas case about a different incentive rate treatment and I know Judge Randolph didn't agree with the commission's position there, but so 219 is, you know, providing, you know, instruction to us to put forward a lot of rules for a lot of permitting us to have this additional cost-based recovery as the system operator's doing here. Otherwise, there wouldn't, you know, that's the statutory mechanism for the system operator to say to the commission, we would like to have this additional, you know, cost-based mechanism to recover these. I mean, it's requiring you to do that, but I take your point. It's requiring us to allow the fees. If it were requiring, and this gets to my point about the low impact, if it were requiring us to have a special cost-based mechanism, then all parties would need to be able to recover their low impact fees, but everyone presumes that those fees to comply with low impact are being recovered in the market. It says that we need to allow recovery of prudently incurred costs, but we don't read it as requiring us in the rule to have said add to all tariffs this specific mechanism. We told the entities that they could file rates with us, and in 3535C, we said those rates needed to comply with 205 and the background rules, and I think I've gone over that, so I don't mean, I know I'm well over time, and I don't want to belabor the point unless you have further questions. Thank you, Mr. Glover. Thank you. Mr. Jones, you reserve three minutes for rebuttal. We'll give you three minutes. Thank you, Your Honor. There's a lot there. Let me start with the question about market compensation, if I could. First of all, the low impact is if all generators in the market are bearing a cost, there's no concern about undue at 219D, which the commission relies on, does in fact require both just and reasonable rates and unduly discriminatory rates, and if we are required to rely on market compensation for costs that only a few generators bear, that is by definition a discriminatory rate regime which would not satisfy the statute. The problem that we have in this case is if, for example, these incremental costs foisted on us are exactly the costs that make us out of the money in the market, they could cause these units not to clear the market. There's nothing in the record that suggests that the commission ever investigated the sufficiency of market outcomes and market compensation for these rates, and that's exactly why the ISO felt compelled to create a separate transmission rate, which counsel concedes that's what this is. So we have generation rates over here where all the power, the cost of power producing are happening, and we have this critical transmission role that these units play that have to be called out. They are both non-generation costs and they are non-market. So to say that they're just recovered in the market per se, even though the lion's share of generators in the market don't have those costs, again, leads FERC right back into the statutory problem. Now, I'd also like to do address the commission staff, or staff counsel referenced the incentives rule and section 3535 of the regulations. Actually, if you read the incentive rule, you will not find a single mention of the rule against retroactive rate making or the file rate doctrine. So the notion that somehow, you know, the reference to filing requirements in section 3535 of the regulations was putting the world on notice that the commission intended to do this is not credible in our view. Were you keeping, were your clients keeping a separate account for the attributable to the section 219? Your Honor, we have tracked them, yes. Merchant generators, non-utility generators by the commission's rules don't have to follow the uniform system of accounts. So I can't tell you exactly what the accounting was, but absolutely we have tracked the costs that were incremental and caused by... Well, if you weren't doing that, I'm a little bit confused about how you separate what you received in the market base rates as opposed to, you know, separating out just the costs that you incurred with respect to the critical facility matter. Well, I guess I would think about it this way, Your Honor. We certainly don't separate them in the day-to-day course. When we make that 205 filing to come into the commission, we can identify the incremental costs that were foisted on us that need to be separated out into that transmission rate. And if I might, on that note, the rates that we filed and commission counsel referenced that we had actually now made these 205 filings, the meat of it, I think it was that was referred to, and I'll give you the FERC docket numbers so your clerks could pull them. The FERC dockets are ER21-774 and ER21-1171. You'll see there is no meat in those filings. And that goes back to how strange this rule actually is. All those filings say is we intend to recover, but it's not until a year from now, as counsel says, well, we're going to do the prudence review. We're going to see the meat. Well, under this rule, we have to file an intent to recover. And then a year from now, we get to come back and say, okay, now here are the costs that we recovered for that year. Of course, disallowing the entire four to five years that we thought we were going to get recovery for. And that then leads me to the question of whether we somehow waited too long. I think the entire notion that we should have done something earlier presupposes that the commission is right. When this was all about the filed rate docker, which we think they're not, while this was all going on, we had a good faith assumption and basis to conclude that the ISO, that we could convince them to include past costs in the rate and that that was lawful. And so the ISO, as Judge Kass pointed out, provided just sort of a non-answer. They decided to punt on this to the commission. But in order for you to conclude that we should have somehow come in earlier presupposes that the commission is right, that there's a file rate doctrine or retroactive rate making issue here when there's just not, there is no rate on file that we have violated in contrary to all the commission's precedent on that matter. I'm out of time unless the court has anything else. I'll thank the court for its time and urge the court to vacate these orders. Thank you, counsel. Thank you to both counsel. We'll take this case under
judges: Srinivasan, Katsas, Randolph